## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **IVORY MAZUR**, *individually and behalf of all others so situated*, | |
| Plaintiff, | |
| *v.* | **Case No.: 2:24-CV-2517** |
| **ANDERSON FINANCIAL SERVICES, LLC, d/b/a LOANMAX**, | **JURY TRIAL DEMANDED** **CLASS ACTION** |
| and | |
| **SELECT MANAGEMENT RESOURCES, LLC,** | |
| Defendants. | |

### COMPLAINT–CLASS ACTION

COMES NOW, Plaintiff Ivory Mazur, by and through the undersigned counsel and, for his Complaint, made on behalf of himself and the proposed class, states and alleges, upon information and belief, as follows:

### INTRODUCTION

1.     Plaintiff is a hardworking man who, in the midst of financial struggles, dedicated himself to an intensive robotics apprenticeship so that he'd have secure employment through Amazon. Defendants' sole member, Rodney Aycox, manages and controls his LoanMax-branded title-lending empire. This lawsuit, however, isn't about the legalized loan-sharking or loopholes that have enabled Mr. Aycox, via LoanMax, to become wealthy. Rather, it's about a particular policy and practice implemented by LoanMax *in addition to* its standard predation. LoanMax has a policy of telling borrowers owed a surplus from the sale of their vehicles that said surplus will be returned within *120 days*. That period is itself completely unreasonable. Beyond that, though,

LoanMax purposely delays returning such surpluses for additional months, even years. In Plaintiff's case, he had to retain, after months of regular calls, an attorney to demand that LoanMax return the surplus he was *legally owed*. Meanwhile, LoanMax may have been using that surplus cash to generate more loans with 300% interest rates. This policy and practice may be compared with that employed by LoanMax when a borrower defaults, whereby the consumer may be assured that LoanMax will demand the maximum conceivably owed with alacrity. Not only is LoanMax's conduct in this regard the result of pure avarice and an attitude of ambivalence towards the law, but it's also unfair, unconscionable, and deceptive. Thus, it's illegal under Kansas law, not to mention the laws of the other states where LoanMax implements this policy.

## PARTIES

2.     Plaintiff Ivory Mazur is a citizen of Ohio, natural person, and consumer. Plaintiff was a citizen of Kansas when he took out the germane loan, which he took out at a/the Shawnee, Kansas location.

3.     Defendant Anderson Financial Services, LLC d/b/a LoanMax is an Idaho corporation registered to do business in Kansas. Per its annual report as filed with the Kansas Secretary of State, Anderson's sole member is Roderick Aycox. Mr. Aycox is, on information and belief, a citizen of Georgia. LoanMax may be served by serving C T Corporation System, 112 S.W. 7th St., Ste. 3C, Topeka, Kansas 66603.

4.     Defendant Select Management Resources, LLC, is a Georgia corporation whose sole member, on information and belief, is Roderick Aycox. Select Management Resources, LLC, may be served by serving C T Corporation System, 289 S. Culver St., Lawrenceville, Georgia 30046.

5. Defendants will be collectively referred to herein as "LoanMax" as they are closely related and ultimately controlled by Mr. Aycox, doing business under the "LoanMax" banner. Discovery will be required as to which entity undertook specific acts or omissions, as described herein.

## JURISDICTION & VENUE

6. This Court has subject-matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a), because there is diversity amongst the parties and the amount in controversy exceeds $75,000.

7. This Court has personal jurisdiction over Anderson Financial Services, LLC d/b/a LoanMax because it's registered to do business in Kansas and does, in fact, do business throughout Kansas.

8. This Court has personal jurisdiction over Select Management Resources, LLC, as it has maintained sufficient minimum contacts with Kansas for such personal jurisdiction to exist. Specifically, Select Management Resources, LLC, is, on information and belief, the parent company of Anderson Financial Services, LLC d/b/a LoanMax. As such, it controls, manages, and/or operates "LoanMax"-branded activities in Kansas. Select Management Resources, LLC, is also the entity that, as shown below, sent Plaintiff the check for the surplus owed him.

9. Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omission's giving rise to Plaintiff's claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

### LoanMax's Business

10.    Anderson Financial Services, LLC, is, as stated, the entity that does business as "LoanMax" in Kansas:

Anderson Financial Services, LLC dba LoanMax

MANAGER

11.    This d/b/a, however, doesn't seem to appear on any filings with the Kansas Secretary of State. Rather, Plaintiff was able to ascertain this entity behind "LoanMax" via a Statement of Final Accounting.

12.    Though Anderson Financial Services, LLC, is organized in Idaho, its official mailing address is in Alpharetta, Georgia. The same is true for a number of other "LoanMax" LLCs: regardless of chartering state, their principal office is at 3440 Preston Ridge Rd. in Alpharetta.

13.    Ultimately, "LoanMax" is a series of pass-through entities that begin and end with Mr. Aycox.

14.    Because LoanMax makes loans that carry interest rates of around 300% per annum, it must typically be located in states that have no applicable usury statute.

15.    LoanMax's business is simple: it makes very high-interest loans with borrowers' vehicles held as collateral. Therefore, there cannot, or should not, be a lienholder relative to a title serving as such collateral; the title must be "free and clear" so that LoanMax can't be a subordinate creditor.

4

16.     When defaults happen, LoanMax acts as a debt collector and may repossess vehicles held as collateral.

17.     Kansas has usury caps for closed-end loans: 36% for the first $860 of the unpaid balance and 21% on the unpaid balance beyond $860. K.S.A. § 16a-2-401(2).

18.     LoanMax gets around this inconvenience by structuring the title loans it makes in Kansas as "lines of credit," as there's no usury cap for open-ended consumer loans.

### Plaintiff's Experience with LoanMax

19.     Plaintiff purchased the germane vehicle – the 2018 Chevy Equinox with VIN: 2GNAXSEV2J6139952 (the "Equinox") – in early 2020. This occurred during a period of particular difficulty and transition for Plaintiff.

20.     Plaintiff moved to Merriam, Kansas, from Ohio and began working at Amazon during April 2020. He was being paid $15 per hour and working no more than 25 hours per week. Because of standard costs of living – rent, insurance, utilities, phone and Internet, etc. – Plaintiff was, at the very best, scraping by.

21.     On or about September 16, 2020, Plaintiff took out the relevant title loan from LoanMax (the "Loan").

22.     The Loan was in the principal amount of $2,900. Plaintiff needed that money for the deposit and first month's rent on an apartment.

23.     Soon thereafter, Plaintiff applied to Amazon's Mechatronics and Robotics Apprenticeship ("MRA") Program. Plaintiff was promptly accepted but then wait-listed multiple times.

24.     Plaintiff finally got into the MRA course, the schools for which were located in Georgia, during July 2021. Plaintiff thereby drove the Equinox from Kansas to Georgia. Plaintiff's stay in Georgia was always to be temporary, solely for the purpose of attending MRA classes.

25.     Plaintiff's MRA classes were highly intensive, and he was stressed out. He was spending approximately eight hours in classes per day and another three studying. Plaintiff's subsidized tuition covered the condensed 2-year degree, housing, food, and additional expenses. His understanding was that, if he failed a single class, he'd be required to return an estimated $48,000 in subsidized tuition. He was staying in a hotel room.

26.     One day, following dinner, Plaintiff returned to find the Equinox gone. Plaintiff spoke with hotel employees and they called the local police, to no avail. Naturally, this situation greatly heightened Plaintiff's stress and he missed a day of school attempting to locate the Equinox.

27.     The Equinox had been repossessed by LoanMax given that Plaintiff had been unable to reconcile his debt with LoanMax before leaving for school.

28.     The Equinox contained various personal possessions, including a laptop, of Plaintiff's that weren't returned to him.

29.     Because of the importance of the MRA Program to his financial future, Plaintiff focused on graduating while blocking out, to the extent possible, the disappearance of the Equinox. Plaintiff graduated in October 2021.

30.     Plaintiff was able to obtain another vehicle and began researching the fate of the Equinox.

31.     Via basic online research, Plaintiff learned that the Equinox was sold, for $18,650, on November 12, 2021.

32.     LoanMax sent Plaintiff a Statement of Final Accounting ("SOFA"), dated November 18, 2021.

33.     The SOFA confirmed that the Equinox was sold for $18,650 on November 12, 2021:

The following is a statement of the sale held on 11/12/2021 under the terms of the security agreements(s) dated 9/16/2020 4:50:49 PM given to you by LM759.

**PROPERTY SOLD**

Year: 2018
Make: Chevrolet
Model: Equinox
VIN:   2GNAXSEV2J6139952

The selling price for the property was **$18,650.00**

34.     The SOFA stated that Plaintiff's final debt to LoanMax, including fees, expenses, and interest, was $8,519.42.

35.     Upon the consummated sale of the Equinox, LoanMax thereby owed Plaintiff a surplus of $10,130.58.

36.     However, Plaintiff didn't receive that surplus for nearly a year:

| | |
|---|---|
| Select Management Resources | **18892** |
| Auction Sales Refund | November 1, 2022 |
| 3440 Preston Ridge Rd  SUITE 500 | |
| Alpharetta, GA 30005 | |

37.     Plaintiff, despite expending significant effort for months attempting to receive this legally and rightfully owed surplus, **didn't receive it until he retained an attorney to do so. Then, the check was cut just days after an attorney-drafted demand letter was sent.**

38.     LoanMax's unlawful retention of Plaintiff's surplus caused him substantial, and eminently foreseeable, injuries.

39.    Further, it reflected a *policy* on the part of LoanMax to purposely delay the return of the surplus.

40.    Specifically, the SOFA said to call 678-823-4735 "to obtain a check for the amount of the overage." That area code is for the greater Atlanta area.

41.    Relatively early in his futile surplus-recovery process, Plaintiff was informed by an ostensible LoanMax manager that the company had a "policy" of waiting 120 days to issue such reimbursement checks.

42.    That policy – taking four *months* to issue a check as to a vehicle that has already been sold – is itself unreasonable, unfair, and unconscionable.

43.    Nonetheless, Plaintiff waited for 120 days and then called LoanMax to inquire as to the overage check. He was informed by a LoanMax agent – "Dahlia" (or "Dalia") – that not only had the check not been cut but Dahlia also knew effectively nothing about it.

44.    Beginning in or about February 2022, Plaintiff called LoanMax every other week in a time-consuming attempt to obtain the surplus. He recorded some of these calls, during which he was routinely routed to Dahlia.

45.    Despite the Atlanta area code for the stated recovery number, Plaintiff had the sense that he was actually being put in touch with someone at LoanMax's Shawnee branch.

46.    Discovery will be required as to whether 678-823-4735 routed to any sort of functional, appropriate department or whether it was, for example, a form of tactical dead end that would route borrowers to local LoanMax agents who knew nothing about the status of surplus checks.

47.    To wit, Dahlia, amongst other excuses, informed Plaintiff that the department supposedly responsible for issuing overage checks didn't "have a direct line."

48.    When Plaintiff asked how he could speak to someone with actual knowledge of the status of his putative check, Dahlia informed him that her manager was "the only one" who could speak with them but that manager was "in a meeting." During another call, that manager was "on vacation."

49.    When Plaintiff asked Dahlia why the check hadn't been issued despite 120 days having passed, she stated, "I don't have that answer." Plaintiff informed Dahlia that he was undergoing financial hardship because of LoanMax's failure to issue the check owed him.

50.    Again, the amount owed Plaintiff was over $10,000 and it's self-evident that people borrowing from LoanMax are in dire financial straits. Indeed, it's likely for this reason that LoanMax felt it could get away with holding borrowers' funds for unreasonable, sometimes indefinite, periods of time.

51.    During this period, Plaintiff was struggling with rent, as well as other expenses, and ended up with an eviction reporting on his credit history.

52.    Plaintiff was eventually able to find an attorney willing to represent him in this regard. **As stated, LoanMax finally cut the surplus check on <u>November 1, 2022</u>, shortly after receiving an attorney-sent demand letter.**

53.    However, because of the need to retain an attorney under a contingency agreement, Plaintiff only netted approximately $6,500 of the surplus owed.

<u>**Similar Complaints**</u>

54.    It doesn't take a great deal of time researching online to realize that LoanMax's conduct in this regard is, befitting of a *policy*, part of a pattern and practice.

55.    On information and belief, in cases even more extreme than Plaintiff's, LoanMax has taken upwards of four *years* to return such a surplus.

56.     Included herein are some similar, specific, exemplar complaints submitted by other consumers via public forums:

57.     Via the Better Business Bureau, a complaint dated **February 13, 2023**: "I obtained a loan from LoanMax in *************** in May 2022. I defaulted and **my vehicle was sold in July 2022**. I am owed nearly $6000 from the sale of my vehicle and have been in contact with Select *************** since August 2022. **The phone numbers I have for Select *************** seem to be disconnected**. I do not understand why it is taking so long to issue me the refund I am owed." (emphasis added). LoanMax replied, stating, unsurprisingly, that *the check had been mailed February 13, 2023*–i.e., the date of the complaint. The USPS tracking number submitted by LoanMax stated that a delivery had occurred in *Alpharetta, Georgia, on February 23rd*.

58.     Via the Better Business Bureau, a complaint dated **December 27, 2022**: "[LoanMax] . . . **sold [the borrower's truck] [on] August 22, 2022. We just got a letter regarding this on October 21, 2022**. It has been 12 weeks since it has been sold and when we called to see about the payment (**because it was sold for almost $6*** more than what we borrowed**) we are just getting the run around. Nobody can help and right now we are in need of this money that is owed to us. **We have called and called and today when we called they told us that the check has no[t] even been cut**." (emphasis added). Again, LoanMax responded, stating that the check had been mailed, with the borrower eventually stating they received it on *January 25, 2023.*

59.     Via the Better Business Bureau, a complaint dated **December 1, 2022**: "I had a loan max title loan in June of 2021. **I failed to make payments and had my vehicle repossessed in May of 2022. My vehicle was auctioned and sold for approximately $13,500 more than what**

**I owed to LoanMax**. I was sent a letter to call their 800 number to claim my overage payment. **I was told I had to wait 120 days for my check**. Ridiculous but I had no choice. **As of today I have waited MORE than 120 days and cannot get a straight answer from LoanMax as to when I will receive my money**." (emphasis added).

60.     Via the Better Business Bureau, a complaint dated **October 5, 2022**: "**LoanMax owes me $5,634.10 from the illegal auction sale of my vehicle and has advised via phone that the check could take 120 days or more. This is unacceptable and I have seen reviews from individuals waiting for a check since last year**. They are predatory lenders and I consider both the sale of my vehicle and their refusal to send my funds in a timely manner as theft." (emphasis added).

61.     Via the Better Business Bureau, a complaint dated **September 26, 2022**: "In January 2022 loanstar title loans sold my truck at auction, for $2300 more than what I owed them. **In April 2022 I received a letter from them with the details of that sale and the amount due back to me. The letter listed a phone number to call to finalize my claim and have a check mailed out to me for that $2300 owed back to me. I called and was told the check would be mailed to me within 120 days. To be expecting it certified via ***** 120 days came and went. So in August 2022, now we'll over the 120 days I began calling the company**. After several calls and being given the run around I finally spoke with a "manager" who said she did not know how I came up with August but my account showed that my check was scheduled to be delivered to me ON September 9th, 2022." (emphasis added). LoanMax replied, again stating that the check had been mailed. The USPS tracking number submitted by LoanMax stated that a delivery had occurred in *San Antonio, Texas, on October 15th*.

62.     Via the CFPB, a complaint (#4180698), **dated March 3, 2021**, from a servicemember about Select Management Resources, LLC, in Texas: "A few weeks after they took the vehicle and no return calls to work something out I received a letter in the mail from the lender ( which I am now unable to find ) **stating that there was a surplus left and I was going to be getting approximately {$1800.00} +- back and to contact them. When I contacted them, I believe in XXXX of last year ( 2020), they stated it would take them 90-120 days to process the refund check to me. I've been a lender and have not heard of it taking that long to get the surplus funds to a borrower. As of today, XX/XX/XXXX, I have not received anything from the lender**." (emphasis added).

63.     Via the Better Business Bureau, a complaint dated **January 15, 2021**: "Refund of money [due] me. Unfortunately, I got a line of credit on my 2015 Chrysler 200. I then became ill and spent a year in the hospital. Naturally, I was not able to pay my monthly installments. In the process, LoanMax repossessed my vehicle. **On June 1st of 2020 I received a letter saying my car has been sold and there is $3464.60 to be refunded to me and to call a number to receive my check. I first called on June 1st of 2020. I was told it would take a hundred and twenty one days to get my check. I called today and still no check. I asked the lady in the office if there is someone I could talk to and she told me no**." (emphasis added). The consumer later posted that they had received the check on *January 25th*.

64.     Via the CFPB, a complaint (#3782055), **dated August 6, 2020**, about Select Management Resources, LLC, in Ohio: "**I received a letter in the mail stating that my vehicle had been sold and I was due the overage amount as a refund, {$2200.00}. I contacted the company, Select Resource Management as they letter stated and was told it will take 120 days for me to get my refund via certified mail**. This is outlandish and unacceptable. **Reviews**

**of the company via XXXX show that many consumers don't get their refund in that 120-day window and some have never gotten it**. I don't want to experience a similar situation. The vehicle was sold at auction on XX/XX/XXXX, Select Management Resources was paid and now I want my refund." (emphasis added).

65.     Via the Better Business Bureau, a complaint dated **July 29, 2020**: "I was sent a check out on May 2020 and still haven't received it ... it's my understanding that the title company has 30 days after sale of the car to refund the funds to me.... it is now July 29th an no refund has been received... **I've spoken to the repo department over 10 times about this issue and all they are saying is they haven't received the check back yet.... nobody will provide their names or any type of contact for them and this issues has been going on for over 3mos now**." (emphasis added).

66.     Thus, this unreasonable, unfair, and unconscionable 120-day-refund policy *and* subsequent delay tactics have been a LoanMax policy for years, across states.

67.     Similarly, it's obvious that LoanMax has maintained a pattern and practice of simply sitting on funds, often making borrowers waste time and energy begging for the money legally owed them, until consumers retain an attorney and/or file a public complaint.

68.     Plaintiff, as well as every member of the proposed class, has been harmed by LoanMax's conduct in this regard.

69.     Such harm included, but is not limited to, loss-of-use of funds and interest over the germane period.

70.     Such harm included wasted time and emotional distress.

71.     In Plaintiff's case, he also suffered injury in the form of losing approximately 35% of his overage because he was compelled by LoanMax to retain an attorney to actually effect the refund.

72.     In Plaintiff's case, he has also suffered injury in the form of reduced credit expectancy via an eviction reporting that was caused by LoanMax's wrongful withholding of the over $10,000 due him.

73.     Plaintiff also suffered injury in the form of personal possessions that were in the Equinox when it was repossessed but not returned to him.

74.     As described below, Plaintiff seeks declaratory and injunctive relief in the form of a Court order declaring that LoanMax's 120-day refund *policy* is facially unreasonable and enjoining it from continuing to rely on such policy. Under the circumstances – post-sale refunds for lien-less vehicles sold by a sizeable lender – there's no reasonable justification for such a policy.

75.     However, because LoanMax *affirmatively* represents that it has such a policy and yet didn't actually abide by that policy as to the proposed class, Plaintiff, on behalf of the proposed class, adopts that 120-day cutoff for the purposes of the Kansas Consumer Protection Act ("KCPA") claim, as detailed below. 3

## TOLLING OF THE STATUTE OF LIMITATIONS

76.     In March 2020, the Kansas Supreme Court—exercising authority bestowed upon it by the Kansas legislature—tolled the running of all statutes of limitations and repose.

77.     That tolling was repeatedly extended, without disruption, from March 19, 2020 to April 14, 2021.

78.     This resulted in a tolling of 391 days, which extended or suspended the statute of limitations.

79.     Because of this tolling, Plaintiff and the putative class have the same number of days to comply with the statute of limitations from April 15, 2021 as they had when the statute of limitations was extended or suspended on March 19, 2020.

## CLASS-ACTION ALLEGATIONS

80.     Plaintiff, pursuant to Rule 23.1 and Fed. R. Civ. P. 23(b)(2)-(3), brings this action on behalf of all others similarly situated (the "Class"), from October 17, 2019 to the date that the class is certified ("Class Period"), with the Class initially defined as:

**All persons who, during the Class Period, received a LoanMax title loan; had the vehicle securing that title loan repossessed and sold for an amount greater than that owed by the debtor to LoanMax (i.e., a surplus or overage); and who did not receive a check for the entirety of that surplus amount that was dated within 120 days or less of the sale of said vehicle.**

81.     The following persons shall be excluded from the Class (1) LoanMax and its subsidiaries and affiliates; (2) governmental entities; (3) the judge(s) to whom this case is assigned and any immediate family members thereof; and (4) anyone who has previously settled these claims with LoanMax.

82.     The claims for relief asserted herein satisfy the prerequisites for certification as a class action pursuant to Rule 23.1 and Fed. R. Civ. P. 23(b)(2)-(3):

a.      There are questions of law or fact common to the Class;

b.      Plaintiff's claims or defenses are typical of the claims or defenses of the Class;

c.      Plaintiff will fairly and adequately protect the interests of the Class;

d.      The questions of law or fact common to the respective Class members predominate over any questions affecting only individual members;

e.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy; and

f.       LoanMax has acted and/or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class as a whole appropriate.

83.      **Numerosity**.  Per its website, LoanMax has twenty-seven locations in Kansas. All, or nearly all, LoanMax loans are title loans. On information and belief, LoanMax currently holds the title to approximately 3,000 vehicles owned by Kansas consumers. LoanMax loans are, generally, of short duration, subject to very high interest rates, and thereby taken out by consumers who are likely to default in significantly outsized proportion. While discovery is required as to the precise number of Class members, these facts and characteristics suggest that the Class numbers in the hundreds. Members of the proposed Class are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

84.      **Commonality and Predominance.** This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including, but not limited to, the following:

a.       Whether LoanMax maintains a policy of informing borrowers that it has a policy of returning surpluses within 120 days;

b.       Whether LoanMax actually returns such surpluses within 120 days;

c.       Whether LoanMax makes reasonable efforts to return such surpluses within 120 days;

d.       Whether LoanMax maintains a *de facto* policy of delaying, stymying, and obfuscating the status of surplus checks;

e.     Whether LoanMax has profited from undue retention of Class members' overage funds;

f.     Whether LoanMax has violated Kansas law by unduly prolonging the return of Class members' overage funds;

g.     Whether LoanMax's practices are deceptive;

h.     Whether LoanMax's practices are unfair;

i.     Whether LoanMax's practices are unconscionable;

j.     Whether Plaintiff and Class members are entitled to damages, restitution, disgorgement, or other equitable relief; and

k.     Whether LoanMax should be enjoined from engaging in this type of conduct.

85.     **Typicality.** Plaintiff's claims are typical of the claims of the Class because, among other things, Plaintiff, like all members of the Class, was owed an overage check by LoanMax but didn't receive that check within 120 days.

86.     **Adequacy of Representation.**  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

87.     **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy, including, but not limited to, the following reasons:

a.     The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate

17

their claims against LoanMax, so it would be impracticable for the members to individually seek redress for the wrongful conduct;

b.  Even if the members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court; and

c.  No unusual difficulties are likely to be encountered in the management of this class action.

88.  **Ascertainability.**  LoanMax is in possession of the records, in the form of loan documents, default notices, repossession orders, auction receipts, statements of final accounting, and issued checks, necessary to identify members of the Class; as such, the Class will be easily ascertainable.

## COUNT ONE:
## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
*All Defendants*

89.  Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

90.  Plaintiff brings this claim on behalf of himself and the Class.

91.  Plaintiff's LoanMax loan constituted a "consumer transaction" under the KCPA, specifically K.S.A. § 50-624(c).

92.  Plaintiff received the loan in Kansas and primarily for personal, family, household, business, and/or agricultural purposes.

93.    Plaintiff has been damaged and is "aggrieved" pursuant to the KCPA as a result of LoanMax's conduct.

94.    LoanMax is a "supplier" under the KCPA, specifically K.S.A. § 50-624(l).

95.    LoanMax, in the ordinary course of business, solicits, engages in, or enforces consumer transactions, largely in the form of title loans.

96.    The KCPA should be liberally construed to promote its policies of protecting consumers against suppliers that commit deceptive and unconscionable practices. K.S.A. § 50-623; *Williamson v. Amrani*, 283 Kan. 227, 234, 152 P.3d 60, 67 (2007).

97.    LoanMax's violations of K.S.A. § 50-626, Deceptive Acts and Practices, include, but are not limited to:

   a.    Representing, knowingly or with reason to know, that the surplus check had characteristics and/or benefits that it did not have, in violation of K.S.A. § 50-626(b)(1)(A);

   b.    Representing, knowingly or with reason to know, that the surplus check was of a particular standard, when it was of another that differed materially from the representation(s), in violation of K.S.A. § 50-626(b)(1)(D);

   c.    Representing, knowingly or with reason to know and without a reasonable basis to rely upon, that the surplus check had characteristics and/or benefits that it did not, in violation of K.S.A. § 50-626(b)(1)(F);

   d.    Willfully using, in oral and/or written representation(s), exaggeration(s), falsehood(s), innuendo(s), and/or ambiguity(ies) as to material fact(s) in the issuance of the surplus check, in violation of K.S.A. § 50-626(b)(2);

   e.    Willfully failing to state a material fact, or willfully concealing, suppressing, or omitting a material fact about the surplus check, to the detriment of Plaintiff (and the Class), in violation of K.S.A. § 50-626(b)(3);

   f.    Failing to honor the subject express 120-day policy, in violation of K.S.A. § 50-626(b)(1)(A), (b)(2), and (b)(6); and

   g.    Engaging in a pattern of conduct that, when taken in its totality, was deceptive.

98. LoanMax's violations of K.S.A. § 50-627, Unconscionable Acts and Practices, include, but are not limited to:

Generally making unconscionable representations and/or misrepresentations, and/or engaging in unconscionable conduct, in violation of K.S.A. § 50-627(a) including, but not limited to:

a. Taking advantage of the inability of Plaintiff and the Class to reasonably protect their interests because of physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement, or similar factor, as LoanMax knows its clientele is typically financially challenged and easily bullied, in violation of K.S.A. § 50-627(b)(1);

b. Failing to timely honor the 120-day policy such that Plaintiff and the Class members were completely without the owed funds for periods beyond that stated duration, in violation of K.S.A. § 50-627(b)(3);

c. Inducing Plaintiff and the Class members into a transaction that was excessively one-sided in favor of LoanMax, in violation of K.S.A. § 50-627(b)(5);

d. Making a misleading statement of opinion upon which Plaintiff and the Class members relied, to their detriment, in violation of K.S.A. § 50-627(b)(6); and

e. Engaging in a pattern of conduct that, when taken in its totality, was unconscionable.

99. As described, LoanMax gouged Plaintiff and the Class for interest in the hundreds of annual percentage points, ensuring that every possible cent owed LoanMax was timely tallied and collected. However, when LoanMax owed them money, it became – systematically and tactically – absurdly dilatory, routing consumers to know-nothing agents for months while sitting on their cash.

100. Plaintiff and the Class members are entitled to the recovery of their reasonable attorneys' fees, pursuant to K.S.A. § 50-634(e).

101.    Pursuant to K.S.A. 50-634(b), Plaintiff is entitled to recover the greater of his actual damages, including but not limited to, loss-of-use of funds and interest thereon, or civil penalties in the amount of up to $10,000.00 per violation.

102.    Defendants' conduct was intentional, willful, wanton, fraudulent, reckless, and/or malicious.

103.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against LoanMax in such amount as is allowable by law and to be determined at trial, for their actual damages, civil penalties, punitive damages, pre and post-judgment interest at the greatest rate allowable, reasonable attorneys' fees, and for such other and further relief as may be just and proper under the circumstances.

## COUNT TWO:
## <u>VIOLATIONS OF THE UNIFORM COMMERCIAL CODE</u>
### *All Defendants*

104.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

105.    Plaintiff brings this claim on behalf of himself and the Class.

106.    As stated, LoanMax obviously navigated the Uniform Consumer Credit Code ("UCCC"), ensuring that the loans it offers in Kansas and other states are structured as lines of credit so as to avert the usury cap that applies to closed-end credit.

107.    LoanMax is certainly also familiar with the Uniform Commercial Code ("UCC"), as adopted by Kansas, and other states, and its requirement that a secured party "pay" a debtor any surplus resulting from a disposition of collateral. K.S.A. § 84-9-615(d)(1).

108.    While the UCC doesn't seem to posit a bright-line for *when* such a surplus "shall" be paid, it does, in keeping with the UCC as a whole, state that, "**Every aspect of a disposition of**

**collateral, including the method, manner, time, place, and other terms, must be commercially reasonable**." K.S.A. § 84-9-610(b) (emphasis added).

109. LoanMax's 120-day policy isn't commercially reasonable. Of course, then, paying such overages *beyond* 120 days is also not commercially reasonable. LoanMax has thereby violated the UCC as to Plaintiff and each Class member.

110. Following disposition of collateral, such as Plaintiff and the Class members' vehicles, the secured party – here, again, LoanMax – is required to send the debtor a written "explanation" that contains certain information. That mandated information includes "a telephone number or mailing address from which additional information concerning the transaction is available." K.S.A. § 84-9-616(a)(1)(D). The SOFA received by Plaintiff didn't contain such a mailing address; however, it did, as stated, contain a phone number. Crucially, however, Plaintiff wasn't able to actually obtain any sort of meaningful information by calling that number. Consumer complaints make it evident that LoanMax's call lines are designed to hinder, not help, consumers with terse, know-nothing agents. LoanMax has thereby violated the UCC as to Plaintiff and each Class member in this regard as well.

111. Even further, the UCC demands notification in advance of disposition of collateral. K.S.A. § 84-9-611-12. Again, the UCC states that such notification shall be reasonable, with a period of ten-days' advance notice acting as a bright-line for such reasonableness. K.S.A. § 84-9-612. Plaintiff didn't receive such a notice. Discovery is required as to whether, and when, LoanMax has sent such notices of disposition. If LoanMax has maintained a practice of not sending such notices at all, or has sent them at a time that is facially unreasonable, then it has thereby violated the UCC as to Plaintiff and each Class member in this regard as well.

112.    Pursuant to K.S.A. § 84-9-625(b), Plaintiff and the Class members were damaged by LoanMax's failure to supply their overage checks in a commercially reasonable manner and are thereby entitled to recover such loss. These damages include, but aren't limited to, loss-of-use of funds and interest thereon.

113.    Pursuant to K.S.A. § 84-9-625(c)(2), in the case of collateral that is consumer goods, Plaintiff and the Class members, as debtors, are entitled to statutory damages in an amount "not less than the credit service charge plus 10% of the principal amount of the obligation or the time-price differential plus 10% of the cash price."

114.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against LoanMax in such amount as is allowable by law and to be determined at trial, for their actual damages, statutory penalties, pre and post-judgment interest at the greatest rate allowable, and for such other and further relief as may be just and proper under the circumstances.

## COUNT THREE:
### CONVERSION
*All Defendants*

115.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

116.    Plaintiff brings this claim on behalf of himself and the Class.

117.    As described, LoanMax was, in effect, the steward of Plaintiff and the Class members' overage funds and compelled to return those funds in a reasonable, transparent manner.

118.    Instead, LoanMax exploited the fact that it had possession and control of said funds to simply keep them for unreasonable periods of time, thereby forcing borrowers who'd had their vehicles repossessed into further, sustained distress.

119.    The surplus funds always *belonged* to Plaintiff and the Class members, they just couldn't control them while LoanMax was doing so.

120.    By holding those funds well beyond a reasonable processing time, LoanMax acted inconsistently relative to Plaintiff and the Class members' ownership of those monies.

121.    LoanMax's exercise of undue control over the overage funds was unauthorized, unjustified, unreasonable, and inherently interfered with the owners' right to possess those funds.

122.    Plaintiff and the Class members, as described, were damaged by LoanMax's conversion of their surplus funds beyond a reasonable processing time.

123.    Further, LoanMax unfairly profited from retention of those funds and those profits should be returned to Plaintiff and the Class members, including the loss-of-use of funds and interest thereon.

124.    Defendants' conduct was intentional, willful, wanton, fraudulent, reckless, and/or malicious.

125.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against LoanMax in such amount as is allowable by law and to be determined at trial, for their actual damages, punitive damages, pre and post-judgment interest at the greatest rate allowable, and for such other and further relief as may be just and proper under the circumstances.

## COUNT FOUR:
## <u>DECLARATORY & INJUNCTIVE RELIEF</u>
### *All Defendants*

126.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

127.    Plaintiff seeks declaratory and injunctive relief on behalf of himself, the Class, and Kansas consumers generally; he has the right to do so pursuant to K.S.A. § 50-634(c).

128.   This Court has authority to issue declaratory and injunctive relief pursuant to K.S.A. § 50-634(a)(1)-(2), as well as the power to provide injunctive relief under K.S.A. ch. 60, art. 9.

129.   Pursuant to K.S.A. § 50-634(c), Plaintiff may bring a class action for declaratory and injunctive relief regardless of whether he seeks damages or whether there is an adequate remedy at law.

130.   This Court also has, under the UCC, the authority to order that LoanMax dispose of collateral on appropriate terms and conditions. K.S.A. § 84-9-625(a).

131.   As described, LoanMax has maintained a policy of *claiming* that it will provide legally owed surplus funds within 120 days.

132.   This policy has gone on for years, to LoanMax's benefit and the detriment of many borrowers, in Kansas and elsewhere. There can be no reasonable doubt that, as of the filing date of this complaint, LoanMax owes a significant amount of surplus funds to numerous consumers. There are likely some cases in which the surplus has been owed for multiple *years*. Rather than reasonably return these funds, however, LoanMax will continue to profit from them while compelling consumers to post complaints, waste time on the phone, and even retain counsel in order to retrieve the money legally owed them.

133.   Plaintiff, on behalf of himself, the Class, and Kansas consumers generally, seeks an order from this Court declaring LoanMax's stated 120-day policy to be facially unreasonable under the UCC and violative of the UCC.

134.   Plaintiff, on behalf of himself, the Class, and Kansas consumers generally, seeks an order from this Court declaring that LoanMax must issue collateral-disposition notices, as specified in the UCC, at least ten days in advance of the earliest possible disposition date.

135.    Plaintiff, on behalf of himself, the Class, and Kansas consumers generally, seeks an order from this Court declaring LoanMax's stated 120-day policy to be, pursuant to K.S.A. § 50-634(a)(1), (c), a violation of the KCPA.

136.    That is, it's unreasonable, unfair, and unconscionable to posit *four months* as the default standard by which a surplus check may be issued, especially given the circumstances described herein.

137.    Likewise, pursuant to K.S.A. § 50-634(a)(2), (c), Plaintiff, on behalf of himself, the Class, and Kansas consumers generally, seeks an order from this Court enjoining LoanMax from implementing its 120-day policy in Kansas and compelling it to abide by a much shorter, more reasonable surplus-return schedule.

138.    Such an injunction is very much in the public interest. LoanMax is already benefiting from charging desperate borrowers 300% interest rates; when it's compelled to repossess and auction a vehicle, it charges the debtor for the costs stemming from the repossession and auction, as well as the principal owed and exorbitant interest thereon. This is where, legally and equitably, LoanMax's bottom-feeding must end. There's no reasonable justification for its ongoing conversion of surplus funds.

139.    WHEREFORE, Plaintiff, on behalf of himself, the Class, and all Kansas consumers, prays for an order from this Court declaring that LoanMax's 120-day policy is facially violative of the KCPA and UCC and enjoining LoanMax from continuing to implement that policy in Kansas; and an order from the Court stating that LoanMax must, pursuant to the relevant UCC provisions, timely issue collateral-disposition notices.

## COUNT FIVE:
## NEGLIGENGE
### *All Defendants*

140.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

141.    As sophisticated lending institutions, Defendants owed Plaintiff and the putative Class a duty to act with reasonable care, including compliance with state and federal law.

142.    Defendants breached their duty by failing to return surplus from vehicle sales to Plaintiff and the putative Class within a reasonable timeframe.

143.    Defendants' breach of their duty caused Plaintiff and the putative Class to suffer damages in the loss-of-use of funds and interest over the germane period.

144.    But for Defendants' breach of their duty, Plaintiff would not have been harmed.

145.    As a result, Defendants' conduct was negligent, and/or intentional, willful, wanton, fraudulent, reckless, grossly negligent and/or malicious.

146.    WHEREFORE, Plaintiff, on behalf of himself, the Class, and all Kansas consumers, prays for judgment against LoanMax in such amount as is allowable by law and to be determined at trial, for their actual damages, punitive damages, pre- and post-judgment interest at the greatest rate allowable, and for such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

147.    Plaintiff hereby demands a trial by jury on all issue so triable.

Respectfully submitted,

*/s/ Bryce B. Bell*
Bryce B. Bell          KS#20866
Jenilee V. Zentrich     KS#29098
**Bell Law, LLC**
2600 Grand Blvd., Suite 580
Kansas City, MO 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com
JZ@BellLawKC.com
***Attorneys for Plaintiff***